**CORDANT TECHNOLOGY, INC., Plaintiff,**

v.

**ALLIANT TECHSYSTEMS INC., and Hercules, Incorporated, Defendants.**

No. Civ.A. 95–706–JJF.

United States District Court, D. Delaware.

March 26, 1999.

John G. Mulford, Theisen, Lank, Mulford & Goldberg, P.A., Wilmington, DE; of counsel: Carl G. Love, Lynn E. Eccleston, Michael R. Dzwonczyk, Pillsbury

Madison & Sutro, New York City, for plaintiff.

William J. Marsden, Jr. and Joanne Ceballos, Potter, Anderson & Corroon, Wilmington, Delaware; of counsel: James Galbraith, Walter E. Hanley, Jr., Maria Luisa Palmese, and William G. James, II, Kenyon & Kenyon, New York City, for defendants.

## *OPINION*

FARNAN, Chief Judge.

## I. INTRODUCTION

This is an action for patent infringement. The Plaintiff, Thiokol Corporation,[1] is the owner of U.S. Patent Number 4,492,-779, entitled "Aramid Polymer and Powder Filler Reinforced Elastomeric Composition for Use as a Rocket Motor Insulation," which issued January 8, 1985 (the " '779 patent"). (DTX 77). The Defendants are Hercules Incorporated and Alliant Techsystems Incorporated.[2] The Plaintiff charges that the Defendants have infringed and continue to infringe the '779 patent under 35 U.S.C. § 271. In response, the Defendants challenge the validity of the '779 patent under 35 U.S.C. §§ 102(b) and 103. The Court has jurisdiction over the subject matter of this patent dispute pursuant to 28 U.S.C. § 1338(a).

In January 1998, the Court held a bench trial of the liability issues in this action. Trial of all damages issues is deferred. The three principal issues tried were: (1) whether the Defendants have infringed claims 1, 13, 17, 18 and 19 of the '779 patent under the theory of the doctrine of equivalents;[3] (2) whether the patent in suit is invalid under 35 U.S.C. § 102(b)

because the invention was "on sale" or "in public use" more than one year before the filing date of the patent application; and (3) whether the patent in suit is invalid because the claimed invention would have been obvious to a person of ordinary skill in the art. For the reasons set forth below, the Court concludes that the '779 patent is invalid under 35 U.S.C. § 102(b) because the invention was "on sale" more than one year before the filing date of the patent application. The Court further concludes that, if the patent were valid, the Defendants' accused products would infringe under the theory of the doctrine of equivalents.

## II. BACKGROUND

### A. *The '779 Patent*

On December 7, 1981, U.S. Patent Application Serial Number 328,333 was filed in the U.S. Patent and Trademark Office (the "PTO"). The named inventors of the '333 patent application are Kenneth E. Junior and James D. Byrd. This application was later granted on January 8, 1985 as the '779 patent. The claims of the '779 patent are directed toward a method of insulating a solid propellant rocket motor employing an elastomeric composition which consists of a vulcanizable elastomeric component, aramid fibers and a powder filler component. Claim 1 states:

A process for insulating a solid propellant rocket motor, comprising the step of employing an essentially asbestos-free elastomeric composition as an insulating liner, said composition comprising:

A. from 1 to 40 percent by weight of aramid polymer fibers,

---

**1.** Thiokol Corporation has changed its name to Cordant Technology, Inc., and thus moves to substitute Cordant Technology, Inc., a Delaware corporation, as plaintiff in this action. (D.I.187). For the purposes of this Opinion, however, the Court will continue to refer to the plaintiff as "Thiokol," or alternatively, as "Plaintiff."

**2.** Alliant Techsystems Inc. acquired the rocket motor business of Hercules Inc. in March 1995. All parties to this action are Delaware corporations.

**3.** The Plaintiff represents in its Pre–Trial Brief (D.I. 154, at 7) and in its Post–Trial Reply Brief On Liability (D.I. 181, at 48 n. 19) that it is not asserting a claim of literal infringement against the Defendants.

B. from 1 to 75 percent by weight of a powder filler selected from the group consisting of silica, iron oxide, carbon, milled glass, and ceramic clays, and

C. A vulcanizable elastomeric composition including:

(i) a vulcanizable elastomer, and

(ii) vulcanizing agents for said elastomer.

(DTX 77, col. 9, lines 9–22). Claim 13 is dependent from claim 1 and adds the limitation "wherein said vulcanizable elastomer is an ethylene-propylene diene monomer." (DTX 77, col. 10, lines 11–12). Claim 17 is also dependent from claim 1 and adds the limitation "wherein said powder filler is silica." (DTX 77, col. 10, lines 19–20). Independent claim 18 is similar to claim 1 and reads:

A process for insulating a solid propellant rocket motor, comprising the step of employing an essentially asbestos-free elastomeric composition as an insulating liner, said composition consisting essentially of:

A. from 1 to 40 percent by weight of aramid polymer fibers;

B. from 1 to 75 percent by weight of powder filler selected from the group consisting of silica, iron oxide, titanium oxide, carbon, milled glass, and ceramic clays; and

C. A vulcanizable elastomeric composition including

(i) a vulcanizing elastomer, and

(ii) vulcanizing agents for said elastomer.

(DTX 77, col. 10, lines 21–33). Claim 19 is dependent from claim 18 and limits the "powder filler" to silica. (DTX 77, col. 10, lines 34–35).

### B. *The Background of the '779 Patent*

Solid propellant rocket motors are comprised of: (1) the case; (2) the insulation; (3) the propellant; (4) the nozzle; and (5) the igniter. As propellant burns, very high temperatures and high pressure gasses create a harsh, arduous environment within the chamber. The gasses exit through the nozzle, providing the thrust for the motor. (DTX 77, col. 1, lines 16–31; White 893–94). In order to protect the chamber from the hot, erosive propellant gases, an internal insulation is placed between the case and the propellant. The insulation provides thermal isolation and prevents heat transfer from direct exposure to the burning propellant and exhaust gases. (DTX 77, col. 1, lines 32–39; White 893–94).

The addition of fibers, such as asbestos, to insulation formulations has long been recognized to improve the insulation's resistance to erosion. (Moore 811–13). Environmental and health concerns associated with the use of asbestos led manufacturers to seek a replacement for asbestos-containing insulation. (McCauley 261). The Plaintiff's invention consists of the discovery that a combination of powder filler and aramid polymer fibers may be substituted for asbestos in elastomeric compositions suitable for use as rocket motor case insulation. (DTX 77, col. 2, lines 10–14).

### C. *The Accused Compositions*

The Defendants' accused method of insulating solid propellant rocket motors employs insulations that have the designations 178 and 045. These insulations have been used in GEM motors supplied to McDonnell Douglas as strap-on boosters for the Delta II launch vehicle and Orion motors supplied to Orbital Sciences for the Pegasus and Taurus Launch vehicles. (White 894–95). The 178 insulation material was used in GEM motors until the early 1990's; thereafter, the 178 formulation was modified by deleting VANFRE (a minor processing aid), and the insulation materials became known as the 045 material. Currently, the 178 insulation formulation is not used in production GEM motors. The 045 insulation is presently used in production GEM, Orion and Titan motors for Delta, Pegasus, and Taurus Launch vehicles. (White 895–96).

#### D. *The 0073 Contract*

In September 1978, the Air Force awarded Contract No. FO4611–78–C–0073 (the "0073 contract") to the Plaintiff's Huntsville Division. Under the 0073 contract, the Plaintiff was required to develop and deliver a "reduced smoke" rocket motor for the Sidewinder air-to-air missile. The motor is referred to as the "AIM–9L" or "MK36" motor. (DTX 10 at X3880044). The Plaintiff was compensated under the 0073 contract on a "cost plus fixed fee" basis, which meant that the Air Force and the Plaintiff reached an agreement on an initial estimate of what the project would cost the Plaintiff to complete, and then added a fixed fee, or profit, which the Plaintiff would receive upon its performance of the contract requirements. (McCauley 309–10). The Plaintiff's fee under the 0073 contract was $126,078. The fee was determined by taking 6.95 percent of the estimated costs of $1,813,293. (DTX 10 at X3880008).

The 0073 contract included a "Statement of Work" describing the requirements the Plaintiff had to meet in developing and qualifying the AIM–9L motor. In addition to developing the motor, the Plaintiff was required to conduct specified tests of the motor and its components at the Plaintiff's facility and deliver motors to the Air Force for its own testing and evaluation. (DTX 10 at X3880044).

The program was executed in two phases. In Phase I, the Plaintiff developed the motor and conducted "design verification tests." (DTX 10 at X3880044). The Plaintiff was also required to deliver to the Air Force seven inert motors and two motors which would be subject to "cookoff" testing. (DTX 10 at X3880010, X3880049–50). At the end of Phase I, the Plaintiff and the Air Force would review the design, and if the Air Force approved the design, the program could proceed to Phase II. (DTX 10 at X3880051).

Phase II of the contract required that the Plaintiff produce motors in accordance with a specified design for "Preliminary Flight Rating/Qualification" tests to be conducted by the Plaintiff and for flight tests, service life tests and hazard classification tests to be conducted by the Air Force. (DTX 10 at X3880051–52). The 0073 contract imposed extensive reporting requirements on the Plaintiff, including submission to the Air Force of Monthly Status Reports, describing the work done and the results of any tests conducted. (DTX 10 at X38800106–124). The Air Force, however, had no obligation to report to the Plaintiff the results of any testing conducted by the Air Force on the motors delivered by the Plaintiff. (McCauley 308–09).

During Phase I, the Plaintiff was required to commence a one-year accelerated aging study on the propellant, the insulation, and the bonds between the casing and insulation, the insulation and liner, and the liner and propellant. (DTX 10 at X3880049, 051; McCauley 278–79). The purpose of the accelerated aging study was to determine whether the motor could be expected to have a field life of a minimum of five years, and preferably ten years. (McCauley 256, 278–79). Originally, an asbestos-filled insulation designated TI–R300 was contemplated for the interior of the AIM–9L motor casing. (McCauley 260; Hightower 762). The Plaintiff was required to perform the accelerated aging study on the TI–R300 insulation, even though the Plaintiff had extensive experience with TI–R300. (McCauley 260–61). The one-year accelerated aging study was a requirement of the 0073 contract regardless of the insulation that was chosen. (McCauley 310–11; Hightower 762–63).

In April 1978, the Plaintiff began an Independent Research and Development program to replace asbestos in the insulation used in solid propellant rocket motors. (Byrd 72–73). By November 1978, the inventors of the '779 patent, James Byrd and Kenneth Junior, had formulated and tested a Kevlar and silica filled insulation within the scope of claim 1 of the '779

patent. (Byrd 212–13). In August 1979, they arrived at a formulation having 20 parts Kevlar and 45 parts silica powder per 100 parts polyisoprene, which the Plaintiff designated TI–R701. (Byrd 176). TI–R701 is the preferred asbestos-free insulation described in the '779 patent.

During prosecution of the Byrd and Junior patent application, the PTO rejected all of the claims on the basis of a French patent. The rejected claims included claims 18 through 34, which were directed to a method of insulating a rocket motor. To overcome this rejection, the Plaintiff submitted Mr. Byrd's declaration, in which he averred that his invention was reduced to practice before December 10, 1980, the publication date of the French patent, in order to remove the French patent as prior art. (DTX 81 at 79; Byrd 180–81). In his affidavit, Mr. Byrd averred that his invention was reduced to practice after a static test of TI–R701 was successfully performed in a TX–381 char motor.[4] (DTX 81 at 79). The TX–381 char motor is depicted in the Figure of the '779 patent, and the results of the static test are reported in Table VII of the patent. (DTX 77, col. 8, line 64 – col. 9, line 7; Byrd 175; Byrd dep. tr. 188). Mr. Byrd stated in his declaration: "We concluded from this and other tests that KEVLAR is an acceptable substitute for asbestos in rocket motor case insulation." (DTX 81 at 80).

In September 1979, the Plaintiff proposed to the Air Force that TI–R701 insulation be substituted for asbestos-filled insulation in the AIM–9L motor under development. (McCauley dep. tr. 112–15). The Air Force immediately directed the Plaintiff to qualify TI–R701 insulation for use in the AIM–9L motor, and, in November 1979, the Plaintiff commenced such qualification. (DTX 30 at R3099004; Hightower 787–88). Contemporaneously, the Plaintiff also conducted a static test of the AIM–9L motor insulated with TI–

R701 insulation that was a "complete success." (DTX 26 at U2377004–05; McCauley dep. tr. 143).

As of February 1980, all motors built by the Plaintiff for the AIM–9L program were insulated with TI–R701 insulation. (McCauley 330–31). Also in February 1980, the Plaintiff commenced the one-year accelerated aging test program on TI–R701 insulation, as required by the 0073 contract. (McCauley 350–52). Effective May 29, 1980, the Plaintiff and the Air Force entered into a modification of the 0073 contract, referred to as "Mod. 8," which amended the Statement of Work to require that the insulation for the AIM–9L motor contain no asbestos. (DTX 13 at T0486011; McCauley 339). Pursuant to Mod. 8, the Plaintiff was paid an additional fee based upon the same 6.95 percent of estimated cost to which it had agreed in the original contract. (McCauley 321, 341–42).

On June 24, 1980, at a "Critical Design Review" meeting, the Plaintiff presented the results of all Phase I testing to the Air Force, including its conclusion that "TI–R701 (asbestos-free) insulation is an acceptable replacement for TI–R300 in the AIM–9L motor." (DTX 32 at U1804105; McCauley dep. tr. 166–67). As of the Critical Design Review, all design work on the AIM–9L was complete. (DTX 32 at U1804010). From the Air Force's standpoint, the purpose of the Critical Design Review was to decide whether the design should proceed to Phase II. (McCauley 344). On July 2, 1980, the Plaintiff received approval from the Air Force to begin Phase II. (DTX 33 at X3864005).

Mr. Byrd was intimately involved with the program to characterize TI–R701 insulation and with the one-year accelerated aging study. (Byrd 157–58). In an "AIM–9L Insulation Study" report dated November 1980, Mr. Byrd reported that "[p]ractically all data has been obtained

---

4. Although Mr. Byrd's affidavit did not set forth the date on which this static test was performed, Mr. Byrd testified at trial that the test took place in September 1979. (Byrd 183).

that was intended for this program. Only a small amount of aging data remains to be obtained." (PTX 28 at U2399003; Byrd dep. tr. 173). The remaining aging data was collected by February 1981. (DTX 43 at T6199004; McCauley 350–51).

The '779 patent states that a static test "accurately simulates the intended environment of the rocket motor case insulation." (DTX 77, col. 8, lines 56–57). Prior to December 7, 1980, sixteen AIM–9L motors with TI–R701 insulation were static tested and all performed successfully. (DTX 44 at 4).

### E. *The 0014 Contract*

In October 1980, the Plaintiff received an order from a different organization within the Air Force, Eglin Air Force Base ("Eglin") in Florida, for reduced smoke motors for a program that was unrelated to the AIM–9L program. (McCauley 296, 371). The Plaintiff understood that Eglin was supporting a laser beam rider program and wanted to compare the transmissibility of a laser beam through the exhaust produced by smoky motors with the exhaust produced by reduced smoke motors. (McCauley 296, 371–72). The Plaintiff was not involved in the laser beam rider program. (McCauley 372).

At the time, the Plaintiff had on hand AIM–9L motor casings that were insulated and loaded with propellant and could not be used in the AIM–9L program. (McCauley 371–72). The Plaintiff submitted a proposal to Eglin to supply ten motors, and, effective October 29, 1980, entered into Air Force Contract No. F0863–81–C–0014 (the "0014 contract"). (McCauley 188–89; DTX 37). The 0014 contract called for the Plaintiff to complete the assembly of ten motors in accordance with a specified drawing and deliver the motors to a Sled Test Track at Holloman Air

Force Base in New Mexico for testing by the Air Force. (DTX 37 at X3958003, X3958005; McCauley 297). The sled tests performed on the motors by the Air Force were not conducted for the specific purpose of examining the performance of the TI–R701 insulation. (McCauley dep. tr. 192). Furthermore, the Air Force had no obligation under the 0014 contract to supply the Plaintiff with any results or data from such tests. (McCauley 373).

The contract specified a delivery date of November 21, 1980. (DTX 37 at X3958005). The ten motors were shipped to Holloman Air Force Base on November 20, 1980. (DTX 44 at ¶ 21). The Plaintiff characterized the 0014 contract as a "fixed price sale," on which the Plaintiff realized a profit of $708.00. (McCauley 386–88; D.I. 176 at 7 n. 3).

## III. DISCUSSION

### A. *"On Sale" Under 35 U.S.C. § 102(b)*

Section 102(b) of the Patent Act of 1952 provides that no person is entitled to patent an "invention" that was "on sale" more than one year before the filing of the patent application.[5] The '779 patent issued from an application that was filed by the Plaintiff with the United States Patent and Trademark Office ("PTO") on December 7, 1981. The Defendants contend that the patent in suit is invalid because the invention was "on sale" more than one year before the critical date of December 7, 1980. For the reasons stated below, the Court concludes that the patent in suit is invalid under 35 U.S.C. § 102(b).

### 1. *Legal Standard*

 The Court of Appeals for the Federal Circuit has held that an invention may be subject to the "on sale" bar if, prior to the critical date: (1) such inven-

**5.** A person shall be entitled to a patent unless—

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States....

35 U.S.C. § 102.

tion is "substantially completed with reason to expect it would work for its intended purpose," (2) such invention is "embodied in or obvious from the device offered for sale," and (3) the sale was "primarily for profit." *Evans Cooling Systems, Inc. v. General Motors Corp.*, 125 F.3d 1448, 1450 (Fed.Cir.1997) (citations omitted). Recently, however, the United States Supreme Court stated that "[a] rule that makes the timeliness of an application depend on the date when an invention is 'substantially complete' seriously undermines the interest in certainty." *Pfaff v. Wells Electronics, Inc.*, 3en U.S. 4en, 119 S.Ct. 304, 142 L.Ed.2d 261 (1998). The Court reasoned that the word "invention" must refer to a concept that is complete, rather than one that is merely "substantially complete." *Id.* Although a reduction to practice would ordinarily be the best evidence that an invention is complete, the Court cautioned that proof of a reduction to practice is not necessary in every case. *Id.* Rather, the Court envisioned specific circumstances in which "one can prove that an invention is complete and ready for patenting before it has actually been reduced to practice." *Id.* Thus, the Court set forth the following two-pronged test for determining when an invention is subject to the on-sale bar:

> First, the product must be the subject of a commercial offer for sale.... Second, the invention must be ready for patenting. That condition may be satisfied in at least two ways: by proof of reduction to practice before the critical date; or by proof that prior to the critical date the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention.

*Id.* 119 S.Ct.at 306–312. The burden is on the party challenging a patent's validity to show by clear and convincing evidence that the patent was on sale more than one year prior to the filing date of the application. *See Applied Materials, Inc. v. Advanced Semiconductor Materials America*, 98 F.3d 1563, 1569 (Fed.Cir.1996).

A single sale or even a single offer to sell primarily for profit is sufficient to trigger the "on sale" bar. *See In re Caveney*, 761 F.2d 671, 675 (Fed.Cir. 1985). By contrast, a product offered for sale more than one year before the filing date may escape the statutory bar where such sale was primarily for a bona fide experimental purpose, to perfect the invention. *See U.S. Environmental Products, Inc. v. Westall,* 911 F.2d 713, 716 (Fed.Cir. 1990). Once a *prima facie* case of sale has been established, the burden is on the patentee to come forward with convincing countervailing evidence of experiment. *Id.* It is well-settled, however, that testing of a device to determine suitability for a customer's unclaimed need is not experimental use that will negate commercialization by the inventor. *La Bounty Mfg., Inc. v. United States Int'l Trade Comm'n,* 958 F.2d 1066, 1074 (Fed.Cir.1992).

An invention is reduced to practice when an actual embodiment which includes all elements of the claim has been built. *RCA Corp. v. Data General Corp.*, 887 F.2d 1056, 1061 (Fed.Cir.1989). Additionally, reduction to practice requires that the invention be sufficiently tested to demonstrate that it will work for its intended purpose. *See Seal-Flex, Inc. v. Athletic Track and Court Construction*, 98 F.3d 1318, 1324 (Fed.Cir.1996); *A.B. Chance Co. v. RTE Corp.*, 854 F.2d 1307, 1311–12 (Fed.Cir.1988). "[E]xperimental use, which means perfecting or completing an invention to the point of determining that it will work for its intended purpose, ends with an actual reduction to practice." *RCA Corp.*, 887 F.2d at 1061.

### 2. *On Sale*

The Defendants contend that the Plaintiff's offer in September 1979 to provide AIM–9L motors insulated with TI–R701 insulation, in conjunction with the formalization of the offer and its accep-

tance by the Air Force in Mod. 8 of the 0073 contract effective May 1980, was an offer to sell devices made by the processes claimed in the '779 patent and placed the invention on sale before the critical date of December 7, 1980. Similarly, the Defendants contend that the Plaintiff's entry into the 0014 contract and its delivery of AIM–9L motors insulated with TI–R701 insulation pursuant to the contract was a sale of devices made by the processes claimed in the '779 patent and placed the invention on sale before the critical date. Although the claimed invention is a "process" or "method" for insulating a solid propellant rocket motor, the process itself does not have to be offered for sale to raise the bar of section 102(b). Where the claimed invention is a process or method, " 'a party's placing of the product of a method invention on sale more than a year before that party's application filing date ... act[s] as a forfeiture of any right to the grant of a valid patent on the method.' " *D.L. Auld Co. v. Chroma Graphics Corp.*, 714 F.2d 1144, 1148 (Fed.Cir.1983) (citing *Metallizing Eng'g Co. v. Kenyon Bearing & Auto Parts Co.*, 153 F.2d 516, 519 (2d Cir.1946)).

**6.** Nor is there a dispute that, in insulating the AIM–9L motors with TI–R701 insulation, the Plaintiff used the processes claimed in asserted claims 1, 17, 18 and 19 of the '779 patent. Claim 13 differs from the other asserted claims because it recites the vulcanizable elastomer ethylene-propylene diene monomer ("EDPM"). In TI–R701 insulation, the elastomer is polyisoprene, not EDPM. However, the '779 patent recognizes that each of the elastomer materials specified in the dependent claims, including claim 13, is a conventional rubber material whose use in rocket motor insulations was well-known. (DTX 77 at col. 4, lines 54–63). Moreover, Mr. Byrd averred in his declaration to the PTO that the invention of all of the claims being examined, including claim 13, was reduced to practice through a static test of TI–R701 which employed polyisoprene as the elastomeric material. Thus, the Court finds that the recitation in claim 13 of EDPM does not patentably distinguish it from the TI–R701 insulation the Plaintiff used in the AIM–9L and, as such, the invention was "embodied in or obvious from the device offered for sale." *Evans*, 125 F.3d at 1450.

There is no dispute that the Plaintiff entered the 0073 and 0014 contracts with the Air Force and that TI–R701 insulation was incorporated in AIM–9L rocket motors supplied to the Air–Force under the contracts.[6] The Plaintiff contends, however, that such sales were not made "primarily for profit," but rather were made for experimental purposes and thus do not trigger the "on sale" bar of § 102(b).

### 3. *Reduction to Practice*

The Defendants contend that the claimed invention was reduced to practice prior to the critical date of December 7, 1980. In support of their contention, the Defendants allege that the Plaintiff admitted, through Mr. Byrd's declaration to the PTO and his subsequent testimony, that the invention was reduced to practice in September of 1979. Mr. Byrd's declaration, submitted to overcome the PTO's rejection of the Plaintiff's application based on the French patent, stated that the invention was reduced to practice before December 10, 1980 when a static test of TI–R701 insulation was performed in the test motor illustrated in the Figure of the '779 patent.[7] (DTX 81 at 79). At trial, Mr.

**7.** In his declaration, Mr. Byrd avers the following:

Mr. Junior and I reduced our invention to practice prior to December 10, 1980.... [P]rior to December 10, 1980, three rocket motors were built: a first rocket motor including case insulation according to the present invention; a second rocket motor including case insulation with asbestos; and a third rocket motor including case insulation with silica filler only. The motors each corresponded to the drawing figure and the description in the paragraph bridging pages 12 and 13 of our patent application.

The motors were fired in a static test stand, and erosion of each form of insulation was measured as described on page 13 of our patent application. This test is corroborated by Exhibit B attached to this Declaration, setting forth the test results in graphical form.... We concluded from this and other tests that KEVLAR is an acceptable substitute for asbestos in rocket motor case insulation.

Byrd testified that the static test to which he referred in his declaration was conducted in September 1979 and that the test was successful.[8] (Byrd 177–81).

The Defendants further argue that because the Plaintiff submitted Mr. Byrd's declaration in order to overcome the PTO's rejection of its claims and because the PTO relied on it in withdrawing its rejection of the claims based upon the French patent, the Plaintiff is precluded by the doctrine of judicial estoppel from asserting here that the invention was not reduced to practice in September 1979. The doctrine of judicial estoppel " 'seeks to prevent a litigant from asserting a position inconsistent with one that [he or she] has previously asserted in the same or in a previous proceeding.' " *In re Chambers Development Co., Inc.*, 148 F.3d 214, 229 (3d Cir. 1998) (citing *Ryan Operations, G.P. v. Santiam–Midwest Lumber Co.*, 81 F.3d 355, 358 (3d Cir.1996)). Mr. Byrd's declaration stated only that the invention was reduced to practice prior to December 10,

1980. The Plaintiff did not dispute that fact at trial. As such, the Court will not apply judicial estoppel to preclude Plaintiff from denying that the invention was reduced to practice in September 1979.

The Plaintiff maintains that its invention was not reduced to practice before the critical date of December 7, 1980. In support of its argument, the Plaintiff emphasizes that Mr. Byrd, in his declaration, claimed a reduction to practice occurred following the performance of a static test and "other tests." [9] It has been established that the static test occurred in September, 1979, and it is undisputed that the "other tests" occurred prior to December 10, 1980; yet, the Plaintiff denies a reduction to practice prior to December 7, 1980. Therefore, in order to preclude the operation of an "on sale" bar, the "other tests" must have occurred between the dates of December 7, 1980 and December 10, 1980. No evidence has been offered, however, to establish when such "other tests" took place.[10]

(DTX 81 at 79–80). At trial, Mr. Byrd clarified an error in his declaration. His declaration incorrectly stated that three rocket motors were tested; rather, three insulation formulations were tested in one rocket motor. (Byrd 182).

8. Mr. Byrd testified as follows:
 Q And if we look at your Defendants' Exhibit No. 76, that we talked about a minute ago, which is—and the data on Page 4 of that exhibit, am I correct that the data that's in your affidavit is data from the test of TI–R701 insulation that you said took place in September 1979?
 A. Yes, I believe that's correct.
(Byrd 183).
 Q. And is it fair to say that the test was successful?
 A. Yes. Yes. As far as measuring the erosion rate of insulation, yes.
(Byrd 179).

9. In his declaration, Mr. Byrd stated: "We concluded from [the static test of September 1979] *and other tests* that KEVLAR is an acceptable substitute for asbestos in rocket motor case insulation." (DTX 81 at 80 (emphasis added)).

10. Alternatively, the Plaintiff argues that Mr. Byrd's declaration documented a reduction to

practice of only the compositional claims of the '779 patent, which includes both compositional and process or method claims. Mr. Byrd's testimony to this effect was as follows:
 Q. I believe you said that what your affidavit was showing was that there was a reduction to practice of your invention as of September 1979; is that correct?
 A. As of—I would say one of the statements is Mr. Junior and I reduced the invention to practice prior to December 10, 1980. *That was from a compositional standpoint.* The data presented to support that was from an erosion insulation test motor.
(Byrd 189 (emphasis added)). Mr. Byrd further testified, however, that he submitted the declaration in response to the PTO's rejection of *all* of the claims of the '779 patent, including the method claims:
 Q. Right. At this time, the time you filed your affidavit—we'll get to subsequently, but the time you were filing your affidavit, all of those claims, including the method claims have been rejected by the examiner in view of the French patent; isn't that correct?
 A. I believe that's correct.
(Byrd 198). Finally, Mr. Byrd admitted at trial that he didn't distinguish between com-

■ An invention is reduced to practice when an embodiment which includes all elements of the claim has been built and such embodiment has been sufficiently tested to determine that it will work for its intended purpose. *See RCA Corp.*, 887 F.2d at 1061; *Seal-Flex*, 98 F.3d at 1324. The '779 patent provides that a static test, such as the Plaintiff successfully performed in September 1979, "accurately simulates the intended environment of the rocket motor case insulation." (DTX 77 at col. 8, lines 56–58). Rogers McCauley, Program Manager of the Plaintiff's Huntsville Division, submitted an affidavit to the PTO in further support of the Plaintiff's attempt to overcome the PTO's rejection of the '779 patent, in which Mr. McCauley averred that "six rocket motors equipped with TI–R701 insulation were successfully static tested prior to December 7, 1980, under [the Plaintiff's] IR & D program," "sixteen rocket motors equipped with TI–R701 insulation were static tested under the [0073] contract prior to December 7, 1980," and that "the TI–R701 insulation was thoroughly examined after each Air Force Static Test and found to have performed successfully." (DTX 81 at 61). Although the Plaintiff now contends that its claim of reduction to practice was premised on "other tests," purportedly conducted between December 7, 1980 and December 10, 1980, it has not established that any such "other tests" occurred post-critical date.

The Plaintiff represents that its invention was still riddled with risks and uncertainties as of the critical date, however, the record reveals otherwise. After its successful September 1979 static test, the Plaintiff made a proposal to the Air Force

seeking to incorporate TI–R701 insulation in the AIM–9L program in place of the asbestos-containing TI–R300 insulation. Subsequently, the Air Force confirmed it for use in Phase I. (DTX 27 at U2383005–06). A status report generated by the Plaintiff pursuant to the 0073 contract and dated February 1980 states:

> An asbestos-free polyisoprene insulation has been developed for the RS AIM–9L motor. Two factors to be considered in using this insulation in the rest of the motors under this program are lack of test data and insulation installation costs. *The lack of data poses risks, but these risks are believed to be acceptable.*

(DTX 29 at R1447004 (emphasis added)). Further, when the Defendants' attorney questioned Mr. McCauley in a deposition about the report and any perceived risks associated with the TI–R701 insulation, Mr. McCauley's testimony was as follows:

> Q. Was it your view at the time that notwithstanding the lack of data, you were comfortable that the insulation would be successful?
>
> A. Yes.

(McCauley dep. tr. 152). Soon thereafter, the Air Force and the Plaintiff entered Mod. 8 to the 0073 contract, effective May 29, 1980, which required that the Plaintiff utilize a non-asbestos containing insulation in the AIM–9L program. (DTX 13 at T0486011). Although Mod. 8 did not specifically require use of the TI–R701 type of non-asbestos insulation, the Air Force had previously selected TI–R701 for use in the contract. Finally, on June 24, 1980, at a Critical Design Review meeting, the Plaintiff concluded that "TI–R701 insulation is an acceptable replacement for TI–R300 in

---

positional and method claims when he averred that his invention had been reduced to practice prior to December 10, 1980:

> Q. Let's go back to what you said in your affidavit. Just confirm for me, if you can, that in your affidavit, you made no distinction between the method claims that the examiner had rejected and the composition claims that he had rejected?
>
> A. Not in the way it was written.

(Byrd 199). In light of the fact that Mr. Byrd submitted a declaration averring reduction to practice of his invention in an effort to overcome the PTO's rejection of all of the claims (1–34) of the '779 patent, the Court is not persuaded by the Plaintiff's attempt to retroactively limit its assertion of reduction to practice to only the compositional claims of the patent.

the AIM–9L motor." (DTX 32 at U1904105). By December 1980, all testing on the insulation pursuant to the 0073 contract was complete except for the collection of a small amount of data from the one-year aging study, which would be complete in February 1981.

In light of the successful performance of numerous static tests, demonstrating that the invention of the '779 patent would function in its intended environment, and the Plaintiff's own statements and conduct regarding the status of its invention, including Mr. Byrd's declaration to the PTO, the Plaintiff's efforts to incorporate their invention into the ongoing 0073 contract, and the Plaintiff's subsequent reports to the Air Force pursuant to such contract, the Court concludes that the invention of the '779 patent was reduced to practice prior to the critical date of December 7, 1980.

### 4. *Experimental Use*

■ Once the party challenging validity establishes *prima facie* that the invention was on sale or in public use, the patent holder must come forward with "convincing evidence" that the offer for sale, sale or public use was primarily for an experimental purpose—to test the invention—rather than a commercial purpose. *U.S. Environmental Products*, 911 F.2d at 716. In an attempt to rebut the Defendants' showing that the Plaintiff sold its invention under the 0073 and 0014 contracts before the critical date, the Plaintiff contends that: (1) there was no reduction to practice of the invention prior to the critical date because the invention was still in an experimental state; or, alternatively, (2) testing for durability of a product may extend beyond a reduction to practice, thereby preventing the applicability of a section 102(b) bar. Central to the Plaintiff's experimental use defense is its contention that testing for durability via the one-year aging study was not complete until February 1981, after the critical date of December 7, 1980. Specifically, the

Plaintiff states: "[T]he dangers of the formation of cracks and voids as a result of an improper insulation formulation requires extended testing for the durability of that insulation and the method of its application to the rocket motor." (D.I. 181 at 4). For durability to be relevant, it must be a "claimed or inherent aspect of the invention." *Pfaff v. Wells Electronics, Inc.*, 124 F.3d 1429, 1435 (Fed.Cir.1997), *aff'd* 3en U.S. 4en, 119 S.Ct. 304, 142 L.Ed.2d 261 (1998). "This court and its predecessors have stated that the experimental use exception does not apply to experiments performed with respect to nonclaimed features of an invention." *In re Brigance*, 792 F.2d 1103, 1109 (Fed.Cir.1986).

The Plaintiff argues, however, that "durability" was a feature of the invention and that testing for durability, via the one-year aging test, was the primary purpose of the 0073 contract. To the extent that durability is not explicitly set forth as a feature of the invention in the '779 patent, the Plaintiff contends that the notion of durability as a feature of its invention is inherent in the language of the patent. In this regard, the Plaintiff argues that the preamble of the '779 patent, which recites a method for insulating a rocket motor, gives rise to the features of durability and field or shelf life. The Plaintiff states:

> [I]t is of no moment that durability and shelf life (shown through aging tests) are not specifically disclosed in the '779 patent. They are inherent requirements to the functioning of the claimed composition; as such, the need to demonstrate that the rocket motors possess these necessary characteristics is also essential to a determination that the claimed invention will work for its intended purpose.

(D.I. 181 at 11).

In response, the Defendants argue at the outset that the experimental use doctrine does not apply here because the invention of the '779 patent was reduced to practice prior to the critical date. "[E]xperimental use, which means perfecting or

completing an invention to the point of determining that it will work for its intended purpose, ends with an actual reduction to practice." *RCA,* 887 F.2d at 1061. In other words, where an invention has been reduced to practice, "a sale or offer to sell the [ ] invention is no longer justifiable as an experimental use." [11] *Id.*

 The Defendants further argue that the Plaintiff's 0014 contract with the Air Force was not effectuated for the purpose of experimenting with the insulation. The Plaintiff appears to contend that because it received information about the results of tests performed at Holloman on the motors the Plaintiff delivered, the contract's purpose was primarily experimental. For a use or sale to be for experimental purposes, rather than commercial purposes, "it must be clear that the inventor kept control over his invention in the course of its testing." *In re Hamilton,* 882 F.2d 1576, 1580 (Fed.Cir.1989).

> The experimental use doctrine operates in the inventor's favor to allow the inventor to refine his invention or to assess its value relative to the time and expense of prosecuting a patent application. If it is not the inventor or someone under his control or "surveillance" who does these things, there appears to us no reason why he should be entitled to rely upon them to avoid the statute.

*Id.* at 1581. The Defendants emphasize that there was no provision in the 0014 contract requiring the Air Force to supply the test data, nor did the Plaintiff have control over the Air Force's tests. (McCauley 373). Moreover, it is undisputed that the tests for which the Air Force wanted the motors were unrelated to the AIM–9L program and that the Plaintiff

had no involvement in the program in which the motors were to be tested. (McCauley 383–84; McCauley dep. tr. 192).

Finally, the Defendants argue that the Plaintiff's collection of the remaining "small amount" of data in the accelerated aging study after the critical date did not constitute continued experimentation on the invention. The accelerated aging study was a customer requirement under the 0073 contract, which the Plaintiff was obligated to perform regardless of the type of insulation chosen. (McCauley 310–11; Hightower 762–63). Even if the Plaintiff had adhered to its initial proposal to use asbestos-filled TI–R300 insulation, it would have had to conduct the accelerated aging study. Testing, such as that conducted by the Plaintiff in the accelerated aging study, to meet a particular customer requirement does not qualify as "experimental use" under the patent laws.

> It is well settled that "testing" of a device to determine suitability for a customer's particular (unclaimed) need is not experimental use which negates commercialization by the inventor.

*LaBounty Mfg.,* 958 F.2d at 1074.

 In interpreting the asserted claims of a patent, courts should look first to intrinsic evidence of record, such as the patent itself, including claims, specification, and prosecution history. *See Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir.1996); *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979 (Fed.Cir.1995) *(en banc ), aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). Only when intrinsic evidence is insufficient to enable a court to determine the meaning of patent claims may the

---

**11.** The Plaintiff argues that even if their invention was reduced to practice pre-critical date, experimental use may extend beyond the date of reduction to practice. *See Atlas v. Eastern Air Lines, Inc.,* 311 F.2d 156, 162 (1st Cir.1962). The Plaintiff's argument to this effect is unpersuasive. The cases it relies upon in support of its proposition pre-date the creation of the Court of Appeals for the Feder-

al Circuit; recent decisions of the Federal Circuit clearly set forth the rule that experimental use ends with an invention's reduction to practice. *RCA Corp.,* 887 F.2d at 1061 (citing *Pennwalt Corp. v. Akzona, Inc.,* 740 F.2d 1573, 1580–81 (Fed.Cir.1984); *Gould, Inc. v. United States,* 217 Ct.Cl. 167, 579 F.2d 571, 572 (1978); *Ushakoff v. United States,* 164 Ct.Cl. 455, 327 F.2d 669, 672 (1964)).

court properly rely upon extrinsic evidence, such as expert testimony and inventor testimony, to understand and construe the claims. *Vitronics,* 90 F.3d at 1583.

■■■ The Court is not persuaded by the Plaintiff's arguments that durability and field or shelf life are claimed or inherent features of the invention and that the continuation of aging tests until February 1981 demonstrates that testing for durability was ongoing beyond the critical date. Intrinsic evidence does not reveal that durability as shown through aging tests was a claimed or inherent feature of the invention.[12] Because a review of intrinsic evidence reveals no ambiguity as to the presence or absence of durability as a feature of the invention, it is inappropriate to consider extrinsic evidence on the issue. Moreover, the cases relied upon by the Plaintiff in support of its "durability" argument are readily distinguishable from this case. *See Kolmes v. World Fibers Corp.,* 107 F.3d 1534 (Fed.Cir.1997); *Seal-Flex, Inc. v. Athletic Track and Court Construction,* 98 F.3d 1318 (Fed.Cir.1996); *Manville Sales Corp. v. Paramount Systems, Inc.,* 917 F.2d 544 (Fed.Cir.1990). In those cases, durability was either a claimed or inherent feature of the invention at issue, and the offers for sale or sales were made primarily for experimental purposes.

For example, in *Kolmes,* the invention related to a cut-resistant yarn for use in making protective gloves. *Kolmes,* 107 F.3d at 1538. Relying upon claim 1 of the patent, which referred to yarn "for use in making strong, flexible, cut-resistant products," the court found that durability was an inherent feature of the invention. *Id.* at 1540. Thus, the court held that sample gloves containing the patented yarn which were sent to meat-packing plants for testing prior to the critical date were sent for the purpose of testing the durability of the

invention and did not trigger the "on sale" bar to patentability. *Id.*

In *Manville,* the invention, an iris arm device designed to allow the raising and lowering of light fixtures on a 150–foot tall light pole, was "specifically designed to withstand year around weather." *Manville,* 917 F.2d at 550. As such, the court held that durability was a feature of the invention and that the inventor's primary purpose in installing the invention at a rest stop prior to the critical date was to test the device's durability under variable weather conditions. *Id.* at 551.

Similarly, in *Seal-Flex,* the invention related to an "all-weather" surface to be used as an athletic track. *Seal-Flex,* 98 F.3d at 1320. The court found that the patents explicitly called for durability: the patents were entitled "Method for Constructing All–Weather Surface;" the specification recited resistance to "the deleterious effects of sunlight, moisture and weathering" as an object of the invention; and a claim referred to "weather and ultraviolet degradation." *Id.* at 1324. Therefore, the installation of the surface at a high school was for the purpose of all-weather testing and was determined not to trigger the "on sale" bar. *Id.* Moreover, in both *Manville* and *Seal-Flex,* the inventors maintained control over their invention during the experimentation by visiting the sites periodically to inspect and monitor the testing. *See Manville,* 917 F.2d at 547–48, 550; *Seal-Flex,* 98 F.3d at 1320.

These cases are distinguishable from the case at hand because: (1) durability was not a claimed or inherent feature of the Plaintiff's invention; and (2) the 0073 and 0014 contracts were not entered into primarily for purposes of experimentation relating to the durability of the claimed invention.

Moreover, the evidence reveals that the accelerated aging tests were a customer

---

12. The preamble to '779, reciting a method for insulating a rocket motor, gives rise only to the implication that the insulation composition must be operable in the intended environment, a rocket motor. The insulation's operability in a rocket motor was successfully tested via a series of static tests executed prior to the critical date.

requirement under the 0073 contract and were not part of a program of continued experimentation initiated and controlled by the Plaintiff relating to the durability of its invention. One of the Air Force's objectives in executing the 0073 contract was to procure the design and development of a rocket motor that had a minimum shelf life of five years.[13] The Plaintiff has admitted that the objective of the one year aging test was to determine whether the AIM–9L motor could be expected to have a field life of a minimum of five years, and preferably ten years.[14] (McCauley 256, 278–79). There is no dispute that the Plaintiff was required to perform the aging test regardless of the insulation ultimately selected for the contract.

The Plaintiff takes pains to emphasize that the motors delivered under the 0073 and 0014 contracts were experimental in nature: "[E]very motor made under the 0073 was equipped with one or more features that established that its configuration was purely experimental in nature, including those ten motors that went under the 0014 contract to the Holloman test sled of the Rocket Propulsion Laboratory." (D.I. 176 at 11). The Federal Circuit's decision affirming this Court's holding in *RCA Corp. v. Data General Corp.*, 887 F.2d 1056 (Fed.Cir.1989), *aff'g* 701 F.Supp. 456 (D.Del.1988), is instructive to this issue. *Id.* at 1059. In *RCA*, the plaintiff made a proposal to the FAA to supply RTGV systems,[15] which incorporated the claimed invention ("the Cole invention"). The plaintiff admitted that the RTGV device to be supplied pursuant to the contract was the Cole invention "with additional components," and if awarded a purchase contract to supply the RTGV systems, the plaintiff intended to use the Cole invention in the equipment supplied. *Id.* at 1060. As in this case, the plaintiff

---

**13.** Mr. McCauley testified, on cross examination, that "[t]he shelf life goal of the contract was five years, with—the requirement was five years. The goal was ten years. [The Air Force] wanted to make sure that whatever we put into this motor, the changes we made to it, would last for a long period of time and save them reprocurement costs." (McCauley 256).

**14.** The one-year aging test requirement was set forth in the 0073 contract at Paragraph 4.1.4.1. It reads:

 4.1.4.1 Chemical Structure Aging
 Using AFRPL–TR–74–77, "Chemical Structure Aging" as a guide, an accelerated aging program will be conducted. Samples of the accelerated propellant, liner, insulation (including bond lines), and the igniters will be stored at selected temperatures and humidities. A sample test matrix is shown in Table V and should be used as a guide in the selection of temperatures, humidities, and tests to be used in this task. This program shall begin as early as possible in the development phase to provide data prior to Phase II motor fabrication. Sufficient samples shall be provided to the AF to permit testing up to five years. At least one year of testing will be accomplished on this program.
 (DTX 10 at X3880049). The one-year aging requirement of Mod. 8 to the 0073 contract is identical to that of the original contract ex-

cept that Mod. 8 requires only one year of testing, whereas the original contract required one to five years of testing. (DTX 13 at T0486012).

 On direct examination, Mr. McCauley explained the purpose of the one-year aging requirement as follows:
 Q. Paragraph 4.1.4.1. Can you tell me the purpose of that paragraph?
 A. *This is an attempt to provide measured data that says that the field life of this motor would be at least five years, with a goal of ten years.* They have a plan that they subject the propellant liner insulation samples to, bottom lines, igniters and other parts of the system to what they call accelerated-aging program. You store these materials at high temperatures for a long period of time, and end up doing a detail test on them. If there is no degradation after a long-term storage at high temperature, it can be presumed that there would be no degradation at normal storage temperatures.
 Not very many places in the world have 145 degrees continuous for a long period of time. So if it survives that severe an environment, the presumption is that it gives you a higher degree of confidence, it will work in the field for five to ten years.
 (McCauley 278 (emphasis added)).

**15.** An RTGV system is a type of computer display system.

in *RCA* asserted that their proposal could not create an on-sale bar because the proposal was for research and development of the complex RTGV system and was, therefore, an experimental use. *Id.* at 1061. The court stated:

> RCA, nevertheless, argues that an invention which has been reduced to practice cannot be placed on sale in the context of a contract to develop a specifically different product which is in the experimental stage. Reduced to simplest terms, RCA's position is that an offer to sell A, a device reduced to practice, in combination with B, the combination not having been reduced to practice, must be deemed an experimental use of A. We think not.

*Id.* The court rejected the plaintiff's "broad brush approach" that the experimental use exception must be applied to the subject matter of the offer as a whole. *Id.* at 1061–62. Such an approach would circumvent the policies underlying the "on sale" bar, including the policy of preventing an inventor from commercially exploiting the exclusivity of his invention substantially beyond the statutorily authorized period. *Id.* at 1062. Thus, the court held the patent invalid under section 102(b). *Id.*

The *RCA* case is instructive to the case at hand, wherein the Plaintiff confuses the experimental nature of the subject matter of the sale as a whole with the stage of development of the claimed invention. The Plaintiff repeatedly emphasizes that the AIM–9L motors were for experimental purposes only. That contention is irrelevant to the issue of whether the 0073 and 0014 contracts were entered into primarily for the purpose of experimenting with or testing a claimed or inherent feature of the invention itself—the insulation. The Court concludes that the 0073 and 0014 contracts were not entered into primarily

for purposes of testing the durability of the claimed invention, and therefore, the experimental use exception to the "on sale" bar to patentability is inapplicable here. As such, the Court concludes that '779 patent is invalid under 35 U.S.C. § 102(b).[16]

## B. *Infringement Under The Doctrine Of Equivalents*

### 1. *Legal Standard*

 The Plaintiff alleges that the Defendants' accused compositions infringe claims 1, 13, 17, 18 and 19 of the '779 patent under the theory of the doctrine of equivalents. The Plaintiff must prove infringement of the '779 patent by a preponderance of the evidence. *Hughes Aircraft Co. v. United States,* 717 F.2d 1351, 1361 (Fed.Cir.1983). A patent owner may prove infringement under either of two theories: literal infringement or the doctrine of equivalents. Under the theory of literal infringement, infringement occurs where each element of at least one claim of the patent is found in the alleged infringer's product.[17] *Panduit Corp. v. Dennison Mfg. Co., Inc.,* 836 F.2d 1329, 1330 n. 1 (Fed.Cir.1987). Under the theory of the doctrine of equivalents, however, infringement may be established even where elements in the claimed invention are missing from the alleged infringer's product, if the "accused device performs substantially the same function in substantially the same way to achieve substantially the same result as the claimed device." *Malta v. Schulmerich Carillons, Inc.,* 952 F.2d 1320, 1325 (Fed.Cir.1991); *see Graver Tank & Mfg. Co. v. Linde Air Prods. Co.,* 339 U.S. 605, 608, 70 S.Ct. 854, 94 L.Ed. 1097 (1950), *modified by Warner–Jenkinson Company, Inc. v. Hilton Davis Chemical Co.,* 520 U.S. 17, 117 S.Ct. 1040, 137

16. Because patentability is precluded by application of the "on sale" bar of 35 U.S.C. § 102(b), the Court will not address the Defendants' obviousness defense.

17. As stated above, Plaintiff has represented to the Court that it is not asserting a literal infringement claim against the Defendants. (D.I. 154 at 7; D.I. 181 at 48 n. 19).

L.Ed.2d 146 (1997) (declining to overrule *Graver Tank* ).

■ To find infringement under either theory, the Court must undertake a two-step process. First, it must interpret the claims at issue by evaluating the language of the claims ("claim construction"). *Miles Lab., Inc. v. Shandon, Inc.,* 997 F.2d 870, 876 (Fed.Cir.1993), *cert. denied,* 510 U.S. 1100, 114 S.Ct. 943, 127 L.Ed.2d 232 (1994). Claim construction is a question of law. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 977–78 (Fed.Cir.1995), *aff'd,* 517 U.S. 370, 388–90, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996).

■ When construing the claims of a patent, a court considers the literal language of the claim, the patent specification and the prosecution history. *Markman,* 52 F.3d at 979. A court may consider extrinsic evidence, including expert and inventor testimony, dictionaries, and learned treatises, in order to assist it in construing the true meaning of the language used in the patent. *Id.* at 979–80 (citations omitted). A court should interpret the language in a claim by applying the ordinary and accustomed meaning of the words in the claim. *Envirotech Corp. v. Al George, Inc.,* 730 F.2d 753, 759 (Fed.Cir.1984). However, if the patent inventor clearly supplies a different meaning, the claim should be interpreted accordingly. *Markman,* 52 F.3d at 980 (noting that patentee is free to be his own lexicographer, but emphasizing that any special definitions given to words must be clearly set forth in patent). If possible, claims should be construed to uphold validity. *In re Yamamoto,* 740 F.2d 1569, 1571 & n. * (Fed.Cir. 1984) (citations omitted).

■ The second step necessary to a determination of infringement requires a court to compare the accused products with the properly construed claims of the patent at issue to determine whether the accused products infringe under either the theory of literal infringement or under the theory of the doctrine of equivalents ("in-fringement analysis"). *Miles Lab.,* 997 F.2d at 876; *SRI Int'l v. Matsushita Elec. Corp. of America* 775 F.2d 1107, 1121 (Fed.Cir.1985),

### 2. *The Parties' Contentions*

■ The asserted claims recite a method of insulating a solid propellant rocket motor employing a composition containing a vulcanizable elastomer, a powder filler and aramid fibers. The Plaintiff argues that the claim elements of aramid fibers and a vulcanizable elastomer are literally met by the Defendants' 178 and 045 insulation compositions. The Defendants do not dispute that these elements are present in their accused compositions. Thus, the only substantive issues remaining for resolution are: (1) whether the Defendants' 178 and 045 formulations each contain from 1 to 75 percent by weight of a "powder filler selected from the group consisting of silica, iron oxide, titanium oxide, carbon, milled glass, and ceramic clays," or the equivalent thereof, as disclosed in claim 1; and (2) whether the Defendants' formulations each contain silica powder filler, or the equivalent thereof, as disclosed in claim 17. For the reasons stated below, the Court concludes that two ingredients found in the Defendants' compositions, antimony oxide and Dechlorane Plus, are together "equivalent" to the powder fillers listed in the '779 patent, and thus, the Defendants' 045 and 178 insulation formulations infringe claims 1, 13, 17, 18 and 19 of the '779 patent under the theory of the doctrine of equivalents.

### 3. *Claim Construction*

Before determining infringement, the Court must construe the language of the asserted claims. The parties do not dispute the construction of the claim language; therefore, the Court will construe the relevant claim language as defined in the patent specification.

The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by

implication. As we have repeatedly stated, "[c]laims must be read in view of the specification, of which they are a part." The specification contains a written description of the invention which must be clear and complete enough to enable those of ordinary skills in the art to make and use it. Thus, the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.

*Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir.1996) (citations omitted).

Claim 1 discloses a process for insulating a solid propellant rocket motor using a composition comprising: "from 1 to 40 percent by weight of aramid polymer fibers;" "from 1 to 75 percent by weight of a powder filler selected from the group consisting of silica, iron oxide, titanium oxide, carbon, milled glass, and ceramic clays;" and a "vulcanizable elastomeric composition including: (i) a vulcanizable elastomer, and (ii) vulcanizing agents for said elastomer." (DTX 77, col. 9, lines 9–22). As defined in the specification, "percent by weight" means "percent by weight of total composition." (DTX 77, col. 2, lines 38–39). An "aramid polymer" is a "synthetic polymeric resin generally designated in the art as an aromatic polycarbonamide." (DTX 77, col. 2, line 66 to col. 3, line 1). "Powder filler" is defined as "any powder filler with a particle size range, expressed as specific surface, area of from about 1 meter $_2$/gram to about 200 meter $_2$/gram." (DTX 77, col. 4, lines 39–42). An "elastomer" is "any rubber-like substance having some degree of flexibility in the cured, vulcanized, or heat and pressure-converted state." (DTX 77, col. 4, lines 54–56).

Claim 13 is dependent from claim 1 and requires that the vulcanizable elastomer be ethylene-propylene diene monomer. Claim 17 is also dependent from claim 1 and requires that the powder filler be silica. The language of claim 18 is identical to that of claim 1, except that claim 1 describes an insulation composition "comprising" said aramid fibers, powder filler and vulcanizable elastomer, whereas claim 19 describes an insulation composition "consisting essentially of" the same ingredients. Accordingly, the Court construes the relevant language of claim 18 consistent with the Court's construction of the language of claim 1, as set forth above. Claim 19 is dependent from claim 18 and requires that the powder filler be silica. To the extent that a term is not defined in the specification, the Court relies on the plain and ordinary meaning of the term. *See Envirotech Corp.,* 730 F.2d at 759.

### 4. *Infringement Analysis*

#### a. Aramid Fibers and Vulcanizable Elastomer

The Defendants do not dispute that the claim elements of aramid fibers and a vulcanizable elastomer are present in their 178 and 045 insulation compositions. The Defendants' 178 insulation is composed of: 100.0 parts per hundred rubber ("phr") vulcanizable elastomer [ethylene-propylene diene monomer ("EPDM")/1,4 hexadiene polymer (NORDEL 2522E)]; 10.0 phr 2–Chloro–1,3 butadiene polymer (NEOPRENE FB); 20.0 phr aramid fiber pulp (KEVLAR); 4.8 phr antimony oxide; 10.0 phr Dechlorane Plus; and other components. (PTX 33 at A032160). The Defendants' 045 insulation is composed of: 100.0 phr vulcanizable elastomer [EPDM/1,4 hexadiene polymer, (NORDEL 2522)]; 10.0 phr 2–Chloro–1,3 butadiene polymer (NEOPRENE FB); 20 phr aramid fiber pulp (KEVLAR); 6.0 phr antimony oxide; 10.0 phr Dechlorane Plus; and other components. (PTX 34 at A031416; White 900–02).

Both the 178 and 045 formulations contain 11.75% by weight of Kevlar aramid fibers, which falls within the weight range for aramid fibers claimed in the '779 patent, or "from 1 to 40 percent by weight of aramid fibers." (DTX 77; Guillot 454–500). Further, the vulcanizable elastomer

utilized in the Defendants' accused compositions, EPDM, is specifically disclosed in Claim 13. (DTX 77 at Col 10, lines 11–12). Thus, the Court concludes that the elements of aramid fibers and a vulcanizable elastomer disclosed in the '779 patent are present in the Defendants' accused compositions.

### b. Powder Filler

The Plaintiff asserts that the combination of antimony oxide and Dechlorane Plus found in the Defendants' compositions is the equivalent of the powder fillers listed in the '779 patent. A component is equivalent if it differs only insubstantially from the claimed element. *Hilton Davis Chemical Co. v. Warner–Jenkinson Co.,* 62 F.3d 1512, 1521–22 (Fed.Cir.1995) (en banc), *rev'd on other grounds,* 520 U.S. 17, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997). The Plaintiff may establish that the variation from the claim element is "insubstantial" by showing that the antimony oxide and Dechlorane Plus in the Defendants' compositions perform substantially the same function in substantially the same way to achieve substantially the same result. *Graver Tank Co. v. Linde Air Products Co.,* 339 U.S. 605, 608, 70 S.Ct. 854, 94 L.Ed. 1097 (1950).

At the outset, the parties dispute the function of the powder fillers listed in the '779 patent. The '779 patent specification provides that "[a] powder filler is used as a secondary reinforcing agent, and also improves the physical properties of the fiber filled elastomer." (DTX 77, col. 2, lines 46–55). Accordingly, the parties do not dispute that the powder fillers of the invention perform a secondary reinforcing function. The Plaintiff contends, however, that the powder fillers of the '779 patent also serve to disperse the entangled aramid, or Kevlar, fibers during mixing of the

composition. (Guillot 415, 428–29, 436–37, 441–42). The Plaintiff argues that it is "an inherent function of the '779 patent disclosure" that an acceptable dispersion of these Kevlar fibers must be achieved for a satisfactory insulation. (D.I. 178 at 46). In support of its assertion, the Plaintiff claims that lines 41 through 43 of the '779 patent "suggest[ ] the desirability of a homogenous material." (D.I. 178, at 46). Lines 41 through 43 of the patent state: "Too much aramid polymer fiber will result in a very dry, non-homogenous insulation with the appearance of dry cardboard." (DTX 77, col. 2).

The Defendants dispute that aiding in the dispersion of Kevlar is a claimed or inherent function of the powder fillers of the patent. The operative definition of "function" for purposes of an equivalency analysis is the intended function as seen in the context of the patent, the prosecution history, and the prior art. *Zenith Laboratories v. Bristol–Myers Squibb Co.,* 19 F.3d 1418, 1425 (Fed.Cir.1994). The '779 patent provides only that powder fillers perform a secondary reinforcement function. (DTX 77, col. 2, lines 46–47). Nowhere does the patent imply or suggest that powder fillers perform a second dispersive function. The sentence, "Too much aramid polymer fiber will result in a very dry, non-homogenous insulation with the appearance of dry cardboard," speaks only to the consequences of including too much aramid fiber. The Court thus concludes that the sentence cannot be read to imply that powder fillers aid in the dispersion of Kevlar, or aramid, fibers. Further, the Plaintiff has offered no evidence from the prosecution history of the '779 patent or the prior art to establish that the powder fillers of the patent were intended to perform such a function.[18] As such, the

---

18. In an attempt to establish that the powder fillers of the invention perform a dispersive function, the Plaintiff offered the testimony of Dr. Guillot, who testified about the results of tests he conducted which purport to demonstrate the dispersive effect of the powder fillers of the invention, as well as the testimony of Larry Pierce, an expert on the manufacture of rocket motor insulation, who also testified that powder fillers aid in the dispersion of aramid fibers in rocket motor insulation. The evidence offered by the Plaintiff, however,

Court concludes that, for the purposes of an equivalency analysis, aiding in the dispersion of aramid fibers is not a function of the powder fillers listed in the '779 patent.

The parties agree that the powder fillers of the invention perform a reinforcement function, and there is no dispute as to the way in which the powder fillers perform the asserted function, nor is there a dispute as to the result of adding powder fillers to the mix. Generally speaking, "reinforcement" means the enhancement of some useful property of the material, such as tensile strength or elongation. (Guillot 428; Meinecke 987). Powder fillers consist of small particles that, when incorporated into an elastomeric or other polymer material, retain their essential size and shape in the final mix materials. (Guillot 413). Due to their dispersion in the elastomer, the powder fillers increase the physical properties of the material to some degree. (Guillot 428–29). The addition of such powder fillers results in a reinforced insulation material with enhanced physical properties.

In response to the Plaintiff's claims of infringement, the Defendants argue that the antimony oxide and Dechlorane Plus present in their formulations do not perform the function of secondary reinforcement, but instead, perform the functions of char formation and flame retardance. (White 902; Martin 1204–06). The Court of Appeals for the Federal Circuit has stated:

> The limitations and functions of the invention in the claims, not the elements or functions of the accused device, estab-

lish the reference point for the doctrine of equivalents. Infringement under the doctrine does not vanish merely because the accused device performs functions in addition to those performed by the claimed device.

*Miles Laboratories, Inc. v. Shandon Inc.*, 997 F.2d 870, 877 (Fed.Cir.1993) (citations omitted). The Court concludes, therefore, that it is irrelevant to this infringement analysis whether the Defendant's antimony oxide/Dechlorane Plus combination performs functions in addition to the secondary reinforcement function of the powder fillers disclosed in the '779 patent.

In support of its contention that antimony oxide and Dechlorane Plus are reinforcing agents, the Plaintiff relies, in part, upon the testimony of its expert witness, Dr. David G. Guillot, who conducted tests comparing the effects of antimony oxide and Dechlorane Plus with the silica powder filler of the Plaintiff's invention on the properties of a compound consisting of an EPDM elastomer and Kevlar fiber.[19] (Guillot 491). Dr. Guillot contends that the results of these tests establish that the Defendants' antimony oxide and Dechlorane Plus combination performs the same function of secondary reinforcement in the same way to achieve the same result. In response, the Defendants have offered the testimony of their expert witness, Professor Gerhard Meinecke, who also conducted tests comparing the effects of antimony oxide and Dechlorane Plus with the effects of silica. Professor Meinecke testified that the results of his tests establish that antimony oxide and Dechlorane Plus do not

---

failed to demonstrate that, based on the patent itself, its prosecution history, and the prior art, dispersion was an intended function of the powder fillers of the patent.

**19.** In addition to presenting Dr. Guillot's testimony, the Plaintiff offered evidence for the purpose of establishing that antimony oxide and Dechlorane Plus are widely recognized in the art to be powder fillers for use in various resins and elastomers. In this regard, the Plaintiff offered a series of documents (patents, reference sources, articles) which refer

to antimony oxide and Dechlorane Plus as "powder fillers." The Court has reviewed these materials and determined that they are not probative to the issue of whether antimony oxide and Dechlorane Plus are together equivalent to the powder fillers listed in the '779 patent because many of the references do not pertain to the use of powder fillers in rocket motor insulation, and those that do concern rocket motor insulation do not address the reinforcement function of powder fillers.

perform a reinforcing function in rocket motor insulation.

### (i) Dr. Guillot's Tests

Dr. Guillot conducted tests on nine mixes of formulation varying fiber and powder fillers. The first three test formulations contained Kevlar fiber and either silica or antimony oxide/Dechlorane Plus or no powder filler respectively. The next three test formulations contained asbestos fiber and varied the powder fillers as in the first three formulations. The last three test formulations contained no fiber fillers and varied the powder fillers as before.

Each formulation with both fiber and powder fillers contained 20 parts per hundred rubber of filler and 20 parts per hundred rubber of fiber. Additionally, each of the powder fillers were selected to have approximately the same particle size and to fall within the size range identified in the '779 patent. (Guillot 491–94). Specifically, Dr. Guillot used silica, antimony oxide and Dechlorane Plus in a 2 micron particle size, which is within the 1–200 meter $_2$/gram particle size range for powder fillers disclosed in the patent.[20] (Guillot 497; DTX 77, col. 4, lines 40–42). Dr. Guillot tested simplified versions of the 045 and 178 insulations formulations in order to eliminate extraneous materials and isolate the secondary reinforcement characteristics of the respective powder filler ingredients. (Guillot 503–04). Dr. Guillot designed his test after consultation with the Plaintiff's statistical expert, Andrew S. Allen, and, after the tests were performed, Mr. Allen analyzed the results obtained

from a statistical standpoint.[21] (Guillot 491–92).

After the insulation samples were prepared, two sets of mechanical properties tests were conducted, one at Kirkhill Rubber Company and the other at Thiokol's Research and Development Laboratory in Promontory, Utah. The tests were designed to evaluate the tensile strength and elongation properties exhibited by the various samples and were conducted according to widely-recognized ASTM procedures.[22] Upon review of the test results, Dr. Guillot concluded that both the silica powder filler and the combination of antimony oxide and Dechlorane Plus are reinforcing to some degree. Dr. Guillot found that the degree of reinforcement was minor compared to the reinforcement provided by Kevlar, the primary reinforcing agent, but emphasized that both the silica and the antimony oxide/Dechlorane Plus combination provided "definite reinforcement." (Guillot 528). Dr. Guillot also concluded that silica and antimony oxide/Dechlorane Plus perform the reinforcing function in the same way: when incorporated into the elastomeric material, the powder fillers retain their essential shape and size, thereby providing reinforcement. (Guillot 528). The incorporation of silica or antimony oxide/Dechlorane Plus into the formulations tested resulted in improved mechanical properties, such as greater tensile strength. (Guillot 531).

Comparing the measure of mechanical properties for the formulation containing Kevlar and antimony oxide/Dechlorane Plus with the formulation containing Kev-

**20.** Dr. Guillot testified that he chose to use silica and antimony oxide/Dechlorane Plus in a 2 micron particle size because it is the smallest particle size at which all three substances were available at commercial grade.

**21.** Based on Mr. Allen's recommendation, Dr. Guillot prepared two separate batches of insulation per test formulation to determine the batch-to-batch variation of insulation manufactured according to the same specification and according to the same process. (Guillot 504).

**22.** At trial, Dr. Guillot explained:

ASTM is a standard set of test methods that's published ... through ... American Society of Testing and Materials. So [the ASTM procedures] are published and widely used throughout the industry.... And they cover a wide variety of subject[s]. Some of those subjects involve use of rubber.

(Guillot 512).

lar and no powder filler, Mr. Allen, the Plaintiff's statistical expert, concluded that the tensile strength and elongation properties of the formulation containing antimony oxide and Dechlorane Plus were statistically significantly greater than for the formulation with no powder filler. (Allen 666). Comparing the mechanical properties for the formulation containing Kevlar and silica with the formulation containing antimony oxide and Dechlorane Plus, Mr. Allen testified that he was unable to detect any statistically significant difference in the tensile strength and elongation properties of the two formulations.[23] (Allen 664, 666).

### (ii) Professor Meinecke's Tests

The Defendants' expert witness, Professor Meinecke, also prepared a series of formulations to test the reinforcement effects of antimony oxide and Dechlorane Plus.[24] Professor Meinecke made a formulation that precisely matched the Defendants's 045 composition. He also made three formulations identical to the 045 formulation except that in the first, he omitted the antimony oxide, in the second, he omitted the Dechlorane Plus, and in the third, he omitted both. (Meinecke 1007–10). Finally, Professor Meinecke made a composition in which he substituted silica for the antimony oxide and Dechlorane Plus. He used a grade of silica, called HiSil 532 EP, that is the preferred filler of the '779 patent and has an average particle

size of 40 millimicrons. (Meinecke 1009–10).

Professor Meinecke then obtained tensile data (tensile strength and elongation at break) and "Mooney viscosity" data for each formulation.[25] After reviewing the results of the tests, Professor Meinecke concluded that "neither antimony oxide, nor Dechlorane Plus 25, reinforce the materials in any statistically significant way." (Meinecke 1031). Professor Meinecke further concluded that antimony oxide and Dechlorane Plus, when used in unison, "do not provide for any statistically significant degree of reinforcement." (Meinecke 1031). Finally, Professor Meinecke testified:

> The comparison of the effect of HiSil 532 EP on the compound properties compared to all the other compounds ... shows that HiSil 532 EP does provide for a statistically significant increase in tensile properties, meaning it is providing for a statistically significant reinforcement.

(Meinecke 1031–32).

The Plaintiff challenges Professor Meinecke's conclusions on two grounds. First, the Plaintiff contends that Professor Meinecke's comparison of the reinforcement attributes of HiSil 532 EP with those of antimony oxide/Dechlorane Plus 25 was improper because HiSil 532 EP has an average particle size of forty millimicrons,

---

**23.** On cross-examination of Mr. Allen and Dr. Guillot and in their post-trial briefing, the Defendants note that the Plaintiff's test results did not exhibit a statistically significant difference in the mechanical properties for samples containing Kevlar and silica or antimony oxide/Dechlorane Plus, and samples containing Kevlar but no powder filler. Thus, the Defendants argue that the results of the Plaintiff's own tests refute the Plaintiff's contention that antimony oxide/Dechlorane Plus serve a reinforcement function. At trial, Dr. Guillot explained that samples containing Kevlar and a powder filler contain a lower percent by weight of Kevlar (13.3 percent Kevlar) than do the samples containing Kevlar but no powder filler (15.3 percent Kevlar). (Guillot 526). Since Kevlar is the primary reinforcing agent, a formulation with a higher percent by weight

of Kevlar would exhibit higher tensile strength than formulations with a lower percentage of Kevlar. (Guillot 526).

**24.** Professor Meinecke testified that his tests did not conform to ASTM standards. (Meinecke 1016). Professor Meinecke also testified that he did not consult with a statistician prior to developing his testing protocol and didn't have a statistician analyze the results of his tests until a few weeks before trial. (Meinecke 1048–49).

**25.** Prof. Meinecke testified that "Mooney viscosity" is a "measure to indicate the resistance of flow ... of a rubber compound," which also measures reinforcement. (Meinecke 1017, 1038).

whereas antimony oxide/Dechlorane Plus 25 has an average particle size of two microns. Both experts agree that the particle size of a powder filler has a dominant effect on reinforcement characteristics; namely, smaller particle sizes provide higher reinforcement and larger particle sizes provide relatively less reinforcement, all other things being equal. The Plaintiff argues, therefore, that "Dr. Meinecke's tests are undeniably biased to lead to the inevitable result of merely showing a predictable substantially higher reinforcement effect for the smaller particle size silica powder filler." (D.I. 176, at 26–27). Second, the Plaintiff contends that Dr. Meinecke's tests lack credibility because they were intentionally designed to include all of the ingredients of the 045 composition in their entirety, which increases the possibility that extraneous substances might obscure the respective reinforcement effects of the powder fillers.[26]

The Court concludes that Professor Meinecke's methodology, specifically the comparison of the reinforcement effects of powder fillers of varying particle-sizes, was improper because a powder filler with a particle size of 40 millimicrons would inevitably demonstrate higher reinforcement values than a powder filler with a 2 micron particle size. Professor Meinecke's tests did not yield an accurate comparison of reinforcement values because of this built-in predisposition, and, therefore, the Court holds that Professor Meinecke's tests are not probative to the issue of whether the antimony oxide/Dechlorane Plus combination is the equivalent of the powder fillers listed in the '779 patent. At trial, Professor Meinecke conceded that the sole reason that the results of his tests and Dr. Guillot's tests diverged as to the comparative reinforcement effects of silica and antimony oxide/Dechlorane Plus was his use of the smaller particle-size HiSil 532 EP. His testimony to this effect was as follows:

Q. Now, with respect to the employment of silica, you said that you found a statistically significant enhancement of mechanical properties when silica was added in your formulations, and Dr. Guillot in his formulation did not find sufficient enhancement. Do you have an understanding or belief as to what is the reason for that difference?

A. Yes I do.

Q. What is that?

A. It is based upon the choice of the type of silica, the one I used has a much smaller particle size. It is one which is generally considered to be a reinforcing filler. In addition, it is also of the preferred particle size, as stated in the '779 patent. In contrast to Dr. Guillot's silica, which has a vastly larger particle size.

(Meinecke 1042).

It is well-established that "[i]nfringement, either literal or by equivalence, is determined by comparing the accused device with the claims in suit, not with a preferred or commercial embodiment of the patentee's claimed invention." *Martin v. Barber*, 755 F.2d 1564, 1567 (Fed.Cir. 1985); *see ACS Hosp. Systems, Inc. v. Montefiore Hosp.*, 732 F.2d 1572, 1578 (Fed.Cir.1984). The Defendants' limited comparison of the 045 composition to one containing the preferred silica powder filler, HiSil 532 EP, is an attempt to improperly limit the scope of the claimed invention. *Lemelson v. United States*, 752 F.2d 1538, 1552 (Fed.Cir.1985); *Slater Elec. v. Thyssen–Bornemisza Inc.*, 650 F.Supp. 444, 465 (S.D.N.Y.1986). The Defendants' comparison is especially improper here, where Professor Meinecke admitted that the preferred 40 millimicron HiSil 532 EP he used was highly reinforcing relative to the antimony oxide/Dechlorane Plus combination.

26. The Plaintiff contests the evidentiary value of Professor Meinecke's tests on various other grounds which are set forth in detail in the Plaintiff's Post–Trial Brief On Liability. (D.I. 176 at 28).

Unlike Professor Meinecke, Dr. Guillot did not use the preferred mode of HiSil 532 EP as a basis for comparison. Rather, Dr. Guillot used the claims of the '779 patent as a starting point for a determination of equivalence. *Miles,* 997 F.2d at 877 ("The limitations and functions of the invention in the claims, not the elements or functions of the accused device, establish the reference point for the doctrine of equivalents."). Because the patent claims simply recite "silica," Dr. Guillot used silica and antimony oxide/Dechlorane Plus at the same particle size, which was within the 1–200 meter $^2$/gram size defined in the '779 patent. By keeping the particle size constant, Dr. Guillot was able to isolate the effects of the respective powder fillers and thus determine what differences existed between the claim element (silica) and the corresponding elements in the accused compositions (antimony oxide/Dechlorane Plus).

The Court finds that Dr. Guillot's tests were designed to enable Dr. Guillot to accurately detect the differences in reinforcement achieved by use of silica as compared to antimony oxide/Dechlorane Plus. Further Dr. Guillot took extra measures to ensure the reliability of his tests, including conforming his tests to standard ASTM procedures; working with statistician, Andrew Allen, in designing the tests; providing the data he obtained to Andrew Allen for statistical analysis; testing powder fillers of similar particle sizes; and simplifying the test formulations so as to eliminate extraneous influences. As such, the Court accepts and credits Dr. Guillot's conclusions that antimony oxide/Dechlorane Plus perform the substantially the same function in substantially the same way to achieve substantially the same result as the claim elements reciting "powder fillers" or "silica." The Court concludes that antimony oxide and Dechlorane Plus are together the equivalent of both a "powder filler selected from the group consisting of silica, iron oxide, titanium oxide, carbon, milled glass, and ceramic clays," as disclosed in claim 1, and silica powder filler, as disclosed in claim 17.[27] Therefore, the Defendants' accused 045 and 178 insulation compositions infringe claims 1, 13, 17, 18 and 19 of the Plaintiff's '779 patent under the doctrine of equivalents.

## IV. CONCLUSION

For the reasons discussed above, the Court concludes that the Defendants have established that the '779 patent is invalid because the invention of the '779 patent was "on sale" more than one year prior to the filing date of the patent application in violation of 35 U.S.C. § 102(b). The Court further concludes that if the patent were valid, the Defendants' accused compositions would infringe claims 1, 13, 17, 18 and 19 of the '779 patent under the theory of the doctrine of equivalents.

An appropriate Order will be entered.

### FINAL JUDGMENT ORDER

This action came on for trial before the Court, the Honorable Joseph J. Farnan, Jr., Chief Judge of the United States District Court for the District of Delaware presiding, and the issues having been duly tried and a decision having been duly rendered,

IT IS HEREBY ORDERED, DECLARED AND ADJUDGED this 25 day of March, 1999 for the reasons set forth in the Opinion issued this date that:

1. U.S.Patent No. 4,492,779, entitled "Aramid Polymer and Powder Filler Reinforced Elastomeric Composition for Use as a Rocket Motor Insulation," is INVALID under 35 U.S.C. § 102(b) because the invention was "on sale" more than one year before the filing date of the patent application.

---

27. The amount and particle size of antimony oxide/Dechlorane Plus in the Defendants' 045 and 178 formulations are within the claimed range of from 1 to 75% be weight and surface area of 1 to 200 meter $^2$/gram. (DTX 77; Guillot 454–500; Meinecke 1078–80).

2. If U.S.Patent No. 4,492,779 were valid, the Defendants would infringe claims 1, 13, 17, 18 and 19 of the patent under the doctrine of equivalents.